IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

APRIL 1997 SESSION

FILED

July 30, 1997

Cecil W. Crowson
Appellate Court Clerk



| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9604-CR-00141 |
| | ) | |
| vs. | ) | Davidson County |
| | ) | |
| MICHAEL ANTHONY REVLETT | ) | Honorable Thomas H. Shriver, |
| a/k/a MIKE REVLETT | ) | Judge |
| | ) | |
| Appellant. | ) | (Aggravated Robbery, |
| | ) | Aggravated Assault) |

FOR THE APPELLANT:

JOHN E. RODGERS, JR.
Attorney at Law
First American Center
315 Deaderick St., Ste. 1230
Nashville, TN 37238-1230

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

MERRILYN FEIRMAN
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

VICTOR S. JOHNSON, III
District Attorney General

NICHOLAS BAILEY
Asst. District Attorney General
Washington Square
222 - 2d Ave., Ste. 500
Nashville, TN 37201-1649

OPINION FILED: _____

**AFFIRMED**

CURWOOD WITT
JUDGE

**OPINION**

The defendant, Michael Anthony Revlett a/k/a Mike Revlett, was convicted following a jury trial of aggravated robbery and four counts of aggravated assault. The Davidson County Criminal Court, Judge Thomas H. Shriver presiding, sentenced the defendant, a Range II offender, to nine year sentences for each of the four aggravated assault convictions, to be served concurrently to each other but consecutively to a fifteen year sentence for the aggravated robbery conviction. In this direct appeal, the defendant alleges (1) the trial court erred in allowing the jury to consider the offense of aggravated assault on two counts of the indictment alleging aggravated robbery, rather than dismissing these two counts of the indictment outright, (2) the evidence is insufficient to support his convictions, and (3) the sentence is excessive. We affirm the judgment of the trial court.

The evidence is largely undisputed, except for the identification of the defendant as the perpetrator of the crimes. Based upon the evidence developed by the prosecution at trial, on October 1, 1994 at sometime between 7:00 and 7:30 p.m., two men entered the Money Saver Market on Robertson Road in Nashville. Candy Shye, Connie Chapman and Chasity Chapman were present in the store.[1] One of the men positioned himself by the door and acted as a "lookout" during the following events. The other man brandished a handgun at Connie Chapman, who was talking on the telephone, and threatened her. Paralyzed with fear, Ms. Chapman fell to the ground. The gun-wielding robber then demanded that Ms. Shye give him the money from the cash register. As Ms. Shye opened the register, the gun-wielding robber pulled back the hammer on his weapon, which he was holding against Ms. Chapman's head.[2] As Ms. Shye complied with his demands,

---

[1]Ms. Shye was employed as a clerk of the market. Connie Chapman sometimes cleaned and restocked at the market in exchange for foodstuffs. Chasity Chapman is the minor daughter of Connie Chapman, who was helping her mother on the date in question.

[2]The evidence supports the inference that the gun was loaded because the weapon was subsequently fired at other witnesses.

he pointed the weapon at each of the two women and the child.  He also addressed Ms. Shye and the minor Miss Chapman with threatening, profane language, explicitly threatening to kill the child.

After Ms. Shye gave the gun-wielding robber about $730 from the register, both robbers fled the store on foot.  Three individuals who where in the parking lot outside the store, John Wayne Carter, Terri Carter and Joe King,[3] gave chase on foot.  During the course of the chase, the robber with the gun told the Carters and Mr. King to get back and fired two shots in their direction.  Ms. Carter and Mr. King returned to the store, and Mr. Carter briefly retreated in order to get his bicycle.  Mr. Carter resumed chase on the bicycle.  While following the fleeing robbers, he saw a police officer, whom he testified he flagged down and informed of the direction taken by the robbers.

By this time, law enforcement officers had responded to the area of the crime and were searching for the robbers.  Detective Ed Crouch of the Metropolitan Police Department was one of these officers.  While he was searching the area, two men matching a description of the robbers ran out in front of his spotlight.  He observed them scale a fence, and he subsequently found a shirt hanging on the fence and another shirt on a picnic table near the fence.  He was unsure, however, whether he saw the men going over the fence actually losing their shirts as they cleared the fence.  Detective Crouch forwarded a description of the men he had seen over his police radio.

---

[3]The defendant was indicted for aggravated assault of Harold King; however, the Carters testified they were with Joe King.  In all likelihood, Harold King and Joe King are the same individual.  No witness with the last name of King testified at trial, and the state dismissed the count of the indictment pertaining to aggravated assault of Harold King.

The officers on the scene determined that the suspects were likely inside the premises of the apartment complex where Detective Crouch had seen them jump the fence. The officers established a perimeter around the complex. While maintaining this perimeter, Officer Tim Sullivan saw the defendant walk out of the apartment complex. The officer observed that the defendant had grass, dirt and fresh, bloody scratches on his shirtless body. The defendant was also sweaty, hot and smelled of alcohol. The defendant told Officer Sullivan he had been in a fight with his girlfriend and had been dropped off at the apartment complex. Based on the defendant's physical appearance and his similarity to the description given by Detective Crouch, Officer Sullivan suspected the defendant of perpetrating the robbery. Officer Sullivan took the defendant to the Money Saver Market, where he was identified by Detective Crouch as one of the men he had seen run into his spotlight and over the fence, by Connie Chapman and Candy Shye as the gun-wielding robber,[4] by Terri Carter as the man who shot at her husband, Joe King and her, and by "Mr. Harold Kind"[5] as the man he had chased.

No second suspect was ever located. Likewise, neither a weapon nor any money was ever recovered.

The defendant was charged in a six-count indictment with (1) aggravated robbery of Candy Shye, (2) aggravated robbery of Connie Chapman, (3) aggravated robbery of Chasity Chapman, (4) aggravated assault of John Carter, (4) aggravated assault of Terri Carter, and (6) aggravated assault of Harold King. The state dismissed count six of the indictment on the first day of trial. At the close

[4]Chasity Chapman may have identified the defendant at the scene as one of the two robbers, as well. The record is somewhat equivocal as to whether Miss Chapman was still at the market at this point.

[5]This appears to be a reference to Harold King and/or Joe King.

of the state's evidence, the court granted the defendant's motion for judgment of acquittal on counts two and three as to the charged offenses of aggravated robbery, reasoning that the state had failed to prove that either of the Chapmans was robbed because nothing was taken from them. The court ruled, however, the jury could consider the offense of aggravated assault on each of these two counts.

The defendant did not testify. Cindy Lepley testified her younger brother, the defendant, was with her all day. During this time, she and the defendant sealed her wood deck. She testified the scratches on the defendant's body were consistent with injuries the defendant may have received while sealing the deck, and further, these injuries were consistent with those he may have received while doing production work at a job she had assisted him in obtaining a few days earlier. Additionally, she testified the defendant might have gotten grass and dirt in his hair when he was underneath the deck. Ms. Lepley also testified she and the defendant were at a store buying their third 12-pack of beer of the day when the defendant saw a woman he knew and decided to leave with her. This was about 6:25 or 6:30 p.m. On cross-examination, Ms. Lepley admitted she did not remember actually observing scratches on her brother's body or grass and dirt in his hair. She also admitted she had two prior convictions for robbery.

I

In his first issue, the defendant contends the trial court erred in allowing the jury to consider the offense of aggravated assault on two counts of the indictment alleging aggravated robbery, rather than dismissing these two counts of the indictment outright. The defendant argues aggravated assault cannot be a lesser included offense of aggravated robbery as alleged in counts two and three of the indictment because there is no allegation the defendant intentionally or knowingly caused the victims reasonable fear of imminent bodily injury.

4

An offense is generally considered to be a lesser included offense of a charged offense if the elements of the included offense consist of some, but not all, of the elements of the charged offense and if commission of the greater offense does not occur without commission of the lesser offense. State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996) (citation omitted). Moreover, lesser included offenses are distinguished from lesser grade offenses, the latter being established by statute. Trusty, 919 S.W.2d at 310-11. In this case, the relevant indictments allege

> MICHAEL ANTHONY REVLETT a.k.a. MIKE REVLETT on the 1st day of October, 1994, in Davidson County, Tennessee . . . intentionally, or knowingly did take from the person of [victim] certain property, to wit: United States currency of value by violence or putting [victim] in fear; the robbery accomplished with a deadly weapon or by the displaying of any article used or fashioned to lead [victim] to reasonably believe the article to be a deadly weapon in violation of Tennessee Code Annotated § 39-13-402, and against the peace and dignity of the State of Tennessee.

An aggravated assault is committed where a criminal actor "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury" and "uses or displays a deadly weapon." Tenn. Code Ann. §§ 39-13-101(a)(2) (1991) and 39-13-102(a)(1)(B) (Supp. 1996). In this case, the indictment sufficiently alleges the essential elements of aggravated assault. As the supreme court has recognized, the words "putting the person in fear" in the robbery statute should be construed to make assault a lesser included offense of robbery. James v. State, 215 Tenn. 221, 225, 385 S.W.2d 86, 88 (1964) (construing predecessor to current Criminal Code). Moreover, the defendant's complaint that the indictment must fail because it fails to allege intent or knowledge is clearly unfounded. The language of the indictment includes the words "intentionally" and "knowingly."[6] This issue is without merit.

---

[6]Whether such an allegation is, in fact, necessary is the subject of State v. Roger Dale Hill, No. 01C01-9508-CC-00267 (Tenn. Crim. App., Nashville, June 20, 1996), perm. to appeal granted (Tenn. Jan. 6, 1997). The supreme court has yet to issue its ruling.

**II**

In his second issue, the defendant challenges the sufficiency of the convicting evidence. Specifically, he attacks the soundness of the identification procedure based on an allegation the assistant district attorney tainted the state's witnesses' recollections of the defendant's identity by showing them pictures of the defendant just before trial. Contrary to the requirements of the Rules of Appellate Procedure, the defendant cites no authority in support of this argument. <u>See</u> Tenn. R. App. P. 27(a)(7). Consequently, he has waived consideration of this issue. Tenn. Ct. Crim. App. R. 10(b).

Notwithstanding the appellant's waiver of this issue, we note that it is without merit. Candy Shye testified she and the Chapmans met with the prosecuting assistant district attorney general on the Saturday prior to trial. Ms. Shye recalled that the prosecutor had photographs in his folder but he did not show them to her nor did she look at them. Connie Chapman testified the prosecutor had photos in his folder and she briefly glanced at them, although he never took them out to show them to her. Chasity Chapman testified the prosecutor showed her a photograph of "the man who robbed the store"[7] but she did not think her mother or Ms. Shye saw it. Significantly, there is no evidence Ms. Shye looked at the photographs, and she unequivocally identified the defendant at trial.[8] Likewise, the defendant was positively identified on the night of the robbery by Ms. Shye, Connie Chapman, Terri Carter, "Harold Kind" and possibly Chasity Chapman viewing the evidence in the light most favorable to the state, as we are required to do, <u>Jackson v. Virginia</u>, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979), we would find this

---

[7]These are Miss Chapman's words, not those of the prosecutor.

[8]Both of the Chapmans identified the defendant as one of the men who robbed the store, as well. Connie Chapman was initially equivocal in her identification at trial but later expressed confidence in her identification of the defendant.

issue without merit if it was properly before us.

### III

In his final appellate issue, the defendant complains of an excessive sentence. The defendant, a Range II offender, was given an effective 24 year sentence -- four concurrent nine year sentences for each of the aggravated assault convictions, to be served consecutively to a 15 year sentence for the aggravated robbery conviction. The defendant contends he is not a proper candidate for consecutive sentencing.

In general, consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the following criteria exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

7

Tenn. Code Ann. § 40-35-115(b) (1990).

The defendant contends he is not a proper candidate for consecutive sentencing. He says he cannot be considered a "multiple offender"[9] under Code section 40-35-115(b)(2) or a "dangerous offender" under Code section 40-35-115(b)(4) because the inherent danger of the crimes for which he was sentenced has already been incorporated into the criminal code in establishing the range of punishment for these crimes.[10] However, the trial court declined to apply the dangerous offender category to the defendant and instead found consecutive sentencing appropriate based upon the defendant's extensive record of criminal activity. The state has not challenged the trial court's rejection of the dangerous offender category. Thus, we limit our consideration solely to whether consecutive sentencing is appropriate under Code section 40-35-115(b)(2) where the defendant has an extensive record of criminal activity.

As the defendant correctly points out, the supreme court in State v. Gray said

> Even though armed robbery is a dangerous offense, there are increased penalties for that crime. The decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed.

---

[9]The term "multiple offender" as used by the defendant refers to the trial court's classification of him as "an offender whose record of criminal activity is extensive" under the consecutive sentencing statute, Tenn. Code Ann. § 40-35-115(b)(2) (1990), not his Range II sentencing classification. See Tenn. Code Ann. § 40-35-106 (1990) ("Multiple Offender"). Although both classifications are based on a defendant's criminal record, the application of one does not mandate the application of the other in the sentencing process.

[10]The defendant does not challenge the factual basis relied on by the trial court in classifying him as an offender with an extensive record of criminal activity, that is, whether his criminal record is "extensive" under the consecutive sentencing statute. He contends only that the classification cannot be applied to him because he was convicted of inherently dangerous offenses.

**8**

State v. Gray, 538 S.W.2d 391, 393 (Tenn. 1976). This language from Gray is taken from the court's discussion of "dangerous offenders," a classification identical to current Code section 40-35-115(b)(4). Again, the defendant in this case was not consecutively sentenced under that subsection of the Code. As the quoted passage illustrates, the very argument advanced by the defendant was considered by the supreme court in defining when a dangerous offender may be consecutively sentenced. Rather than allowing wholesale consecutive sentencing of dangerous offenders who are already subject to lengthy terms for the commission of inherently dangerous crimes, the Gray court endorsed consecutive sentencing only where aggravating circumstances exist.

The Gray court went on to hold:

> However, [the failure to find aggravating circumstances as related to a dangerous offender] does not preclude the trial court from imposing consecutive sentencing for the commission of dangerous offenses where no aggravating circumstances are present if evidence indicates that the defendant should be sentenced under one of the other classifications.[11]

Gray, 538 S.W.2d at 393-94. In the case at bar, the court did precisely what Gray allows -- failing to find the defendant a dangerous offender, the court nevertheless imposed consecutive sentences through another classification for which consecutive sentencing was appropriate. Accordingly, we reject the defendant's argument that a "multiple offender" under Code section 40-35-115(b)(2) convicted of two or more inherently dangerous crimes is not eligible for consecutive

---

[11]Gray enunciated several categories of individuals for whom consecutive sentencing is appropriate. For the most part, those categories were incorporated into the consecutive sentencing statute. See Tenn. Code Ann. § 40-35-115(b) (1990) and Sentencing Comm'n Comments (acknowledging that Gray is essentially codified in section 40-35-115). Both of the categories relevant to this opinion, an "offender whose record of criminal activity is extensive" and "a dangerous offender whose behavior indicates little or no regard for human life, and [who has] no hesitation about committing a crime in which the risk to human life is high" are codified versions of Gray categories. Compare Tenn. Code Ann. § 40-35-115(b)(2) and (4) (1990) with Gray, 538 S.W.2d at 393.

sentencing.

In conclusion, we fail to find merit in any of the issues presented by the defendant. We affirm the defendant's convictions and the sentence imposed on him by the trial court.

_____
CURWOOD WITT, JUDGE

CONCUR:

_____
GARY R. WADE, JUDGE

_____
DAVID H. WELLES, JUDGE